May it please the Court, for the record, my name is John Bloomquist. I'm an attorney from Helena, Montana. Here on behalf of the appellants, plaintiffs below, Spoklie and Kafka. The two issues that we presented for appeal essentially involved the District Court's failure to invoke Pullman abstention and stay. The federal court matter pending resolution of the state claims presented in the state court. As well as the District Court erred in dismissing plaintiff's constitutional claims as we contend plaintiffs pled potentially viable claims. And the court improperly dismissed those claims under 12b6 standard that this court has set forth. Plaintiffs brought the federal court challenge to challenge a voter pass initiative I-143 in Montana which affected game farms in the State of Montana. Two particular provisions that the plaintiffs challenged were the ban on the transfer of a game farm license to a third party. As well as the prohibition on a game farm operator charging a fee for the fee harvesting or shooting of animals on game farms. The plaintiffs preceded their federal court action with state claims. And particularly the Kafka's, who I represent in the state court matter, filed constitutional claims based on state law in Hill County, the 12th Judicial District in Montana. As well as a takings claim. The Spoklie plaintiffs in a different district filed a state court action later amending to add some constitutional claims under state law as well as takings claims. And there are several other pending state court cases involving the takings issue based on state law throughout the state. And haven't you in those state court actions gotten a pretty clear interpretation of state law? Your Honor, the state claims, the status of those state claims, constitutional question Judge Warner in the Hill County case dismissed the state constitutional claims other than the takings claim. The other cases in state court generally are just stand-alone takings claims. The Spoklie case does have pending constitutional claims which have been submitted to the Sheridan County District Court. But what I'm after is for you to persuade the district court to abstain under Pullman, you've got to show, among other things, that state law is unclear. Yes. And you're arguing that despite these state law decisions, that state law under this initiative is still unclear? Yes. In what respect is it unclear then? The third prong of Pullman. We believe that the outcome of the state claims is still unclear. And what aspect of the Montana law do you claim is unclear that has bearing on the claims, the constitutional claims you seek to litigate here? Okay. The, other than the takings claim, which of course arises. The federal claim. Right. I'm asking what parts of state law are unclear? Well, first of all, the state takings claim has not been adjudicated by the state courts. They have been tried. But that's not part of the statute. That's really more part of the state constitution? The state's constitutional claim to the state cases involving the takings question under state law. One case has been tried. We don't have a decision yet. That's the Coffman case. That case also involved other constitutional claims based on state law that Judge Warner dismissed. But Judge Warner also denied the state's Rule 54B certification motion. That, those claims have not yet gone to the Montana Supreme Court, if you will, for a final determination on those constitutional claims. What I'm after is as follows. The basic structure of Pullman is this. That the federal district court should abstain under Pullman if there is an unclear question as to what the state statute means. And if by a narrow construction or some different construction of the state statute, the federal question might look different. What is it about this state I-143 that might change with the state court litigation? It seems to me that it's quite clear. It does two things, both of which you object to. Number one, it forbids the transfer of the permit. And number two, it forbids fee shooting. I think what could result, the determinative issue of state law, which is unclear, I think, stems on the takings question. Okay? It's not an unclarity about I-143. It's a lack of clarity about whether or not this is unconstitutional under state constitutional law. Right. Right. And if I can articulate, Your Honor, those questions are particular to a set of facts. It's an ad hoc factual analysis. So the determination of the takings claim for the state court, the result is unclear because they are ad hoc factual determinations. That is to say they're specific as to each game farm that's affected by this? Yes. Then how can the state adjudication of the state cases affect our decision here if it's ad hoc, because this one itself has got its own individual facts? Well, as the Court — as this Court has stated in terms of looking at Pullman, whether it's San Marino Hotel, Sinclair Oil, or the Columbia Basin Apartments case, if the policy of Pullman, if the Federal court can avoid sensitive Federal constitutional questions, or if those constitutional questions, Federal constitutional questions could be narrowed or moot by determination of the state courts, then the court should invoke Pullman and stay the matter. And in this particular case, we have state takings claims pending, the determination of which may moot the entire need or obviate the need to pursue the Federal claims, including takings. If — Now, have you asked in any of these state proceedings that they be stayed, depending on the outcome of your Federal case? We have not. In the Kafka case, the — Kafka's pursued both their constitutional claims and their takings claims. Other state cases have been pursued on the takings basis. The Spokley plaintiffs in — as the State points out in their letter briefing to the Court, and while we respond, the Spokley plaintiffs asked the State district court to basically bifurcate that case. There are several State constitutional claims, Federal constitutional claims, and statutory construction claims presented to that court. The way we read what — what the Spokley plaintiffs did, and I am not their counsel in the State court, they asked Judge Cebulski to stay that matter pending a resolution of the Kafka constitutional state claims in part, and also referred the court to the proceedings going on here. But importantly, I think, the way we read that is everybody is aware of the Kafka case. The constitutional claims in the Kafka case are well ahead of any other State proceeding. And those claims are likely to end up in the Montana Supreme Court ahead of any of the other cases. And that is what the Spokley plaintiffs, the way we read it, were asking for. Now, I think that Pullman is judged on at least a discretion standard. Is that right? The — it is not mandatory to abstain under Pullman. This Court has said, again, in those three cases that I cite to, that if the three prongs of Pullman are met, the district court should stay the matter. And in this case, Judge Haddon, even though it was briefed, and it was an unopposed motion, I might add as well, did not explain the reason not to stay. He simply denied to stay. And again, when we look at the test articulated by this Court on Pullman, we believe all three prongs are met, particularly when you look at the State court actions and the State constitutional claims that are being made in three areas. The State, the taking claim, which I've already talked about, the fundamental rights claim, which was brought up to Judge Warner. Subsequently, there have been some Supreme — Montana Supreme Court cases interpreting Article II, Section 3 in Montana's inalienable or fundamental rights that we believe have significant bearing on the State law question of that count, which we also brought up in this case, which was dismissed. And the substantive due process claim, which is distinctly different than Judge Haddon's analysis in this case. And those three particular claims, which will be dealt with by the Montana court system, may obviate any need for Federal court involvement. In other words, we believe that those determinative issues of State law will moot or narrow the need for Federal court involvement. And given the standards that we articulated by this Court, we think Pullman should be more. Assume for the purposes of argument that we sustain District Judge Haddon on Pullman. Mm-hmm. Do you want to get to the merits? Yeah. As far as did the plaintiffs advance potentially viable constitutional claims, we think we did. And, of course, we pled those sufficiently. And in particular, count five, count on retrospectivity, when you read Landgraf, when you read Eastern Enterprises, when you look at the admonition under Article I, Sections 9 and 10 of the Constitution, we think we sufficiently pled a claim. Why is this a retroactivity claim? Retroactivity ordinarily attaches different consequences to acts already completed than they had under the law as it existed. That is to say, I did something today because it was legal today. You change the law tomorrow, all of a sudden making illegal what I did yesterday in reliance on the old law. This is a prospective statute. That is to say, it forbids future transfer of the permits, and it forbids future fee hunting. Now, it may reduce the value of the property and of the enterprise because that which was previously permitted is no longer permitted. But it does not make illegal acts that were undertaken under the old law. It's purely prospective in its operation. Why is it retroactive in the Landgraf sense at all? Okay. And we believe that Landgraf articulates that even though a law may act prospectively, if the effect of the law, and it's the effect that's the key, impairs or takes away those or, importantly, attach new liabilities or disabilities to those transactions that have passed, the law can be impermissibly retrospective. And the key here is, as we've pled in the complaint, is what led up to I-143 and the efforts and what these plaintiffs went through in terms of licensing, acquisition of property, building the necessary fences, all the things that go along with being put into business here, which on November 7th of 2000 was eliminated. But, counsel, are you saying that there was a vested right to carry on this business as it was contemplated prior to the statute in question? No. Okay. There's not a vested right. There is a vested interest that we briefed and we talk about and the State looks at. We're not claiming, as the State says, a right to any interest in pre-I-143 legislation. What we are claiming is that as a result of the existing law existed prior to I-143, vested interest or vested rights were implicated by that measure. And in particular, certain transactions and obligations had new disabilities attached to them, new liabilities attached to them. Counsel, aside from Landgraf, which sets the general proposition, what case most closely approximates your argument? In the cases we cited, I think the Eastern Enterprises case most closely approximates the point that we're trying to make in that the new legal consequences which attach to these past transactions, which were all completed prior to the measure, these obligations with the lending institutions where these plaintiffs went out, in particular instance, the coffers as we plead and brief, literally restructured their entire operations. Of course. But that doesn't seem to me to make it anything other than a genuine takings claim and a genuine substantive due process claim. Let's just say you have a claim, but as in striking this retroactivity claim, it comes under those other two headings. Well, and that's when you look at retrospectivity in the light of what is the effect of the act, that is where we argue it is a retrospective law. Retrospectivity looks to the effect, much like takings looks to the effect, much like substantive due process looks to the effect. Is it arbitrary in a substantive due process realm? Did it take private property without compensation in the takings realm? The retrospectivity is a single stand-alone count that we've pled that the courts have recognized can be a constitutional infirmity of a law. The counsel, for example, in Eastern Enterprises that you thought most closely approximated this situation, in that case, the operator, the coal company, was forced to fund health benefits for people who had already retired and after the operator no longer was in the industry. That's clearly an effect for past conduct. How do you think this case is similar to that? Well, what this case is, in terms of the retrospectivity, is to look at, as the courts have indicated, what was the – was there the reasonable reliance, if you will, on the existing law? Did these vested interests become created under the existing law? Does the conduct after the change in the law, are there new liabilities or disabilities attached to those vested interests or those obligations that were added? It sounds like you're arguing for a mandated grandfather clause for any legislation that affects ongoing business. I don't know that we're – I think I-143 would have withstood constitutional muster from a retrospectivity argument if it would have had grandfathering, if it would have had a phase-in approach, if you will, but – which is why grandfathering comes about. But the question is whether or not it's mandated to survive constitutional challenge. And I believe that in this instance, with the vested rights and the situation as we've outlined and pled in our complaint, anyway, we've pled a viable retrospectivity count. Do you know of any case that mandates a grandfather clause? No, I do not. I can't cite you one right now. And we do brief as far as the district court's reliance particularly on the Wallace case. We think the Wallace case was not applicable. The district court looked at Wallace as an application case where the plaintiff in that particular case was arguing some right in the preexisting law when his application was submitted. And the Montana Supreme Court, we think, was very clear that the license in that particular instance was not an entitlement which the Wallaces could rely on the existing law until it was issued. Okay. In this particular case, all the – Why don't we do this? I think we've got your argument in hand. Let's hear from the other side, and then we'll make sure you get enough time for rebuttal. Okay. Okay. Thank you. We're running on the time, and I don't want to cut you short on the rebuttal, so we'll save you some. Good morning, Your Honor. I'm Chris Thweton, Chief Civil Counsel for the Montana Attorney General, representing the State of Montana, the Montana Department of Fish, Wildlife, and Parks, and its Director, Jeff Hagner. Seated with me at council table is Sarah McMillan, who represents the Defendant Intervenors, the Montana Wildlife Federation, and a sportsman for I-143. And with the Court's permission, I'd like to reserve three minutes of my time at the close of argument for Ms. McMillan to address issues with respect to the interests of the Defendant Intervenors. Okay. Try to keep track. Turning first to the abstention argument, I think the procedural posture of this case is quite important in understanding why Judge Hatton's decision not to abstain was particularly appropriate as an application of the equitable principles found in the Pullman Rule. The Kafkas first went into court with respect to the constitutional issues that are in front of the Court today. In February of 2001, they filed a case in the United States District Court for the District of Montana entitled Kafka v. Hagner. They made a motion in that case for a preliminary injunction, which Judge Molloy denied. In an order that is published and clearly foreshadows his intention to dismiss the complainant's failing to state a claim for the constitutional claims that were presented, faced with that denial of the preliminary injunction, the plaintiff voluntarily dismissed that complaint in federal court and sometime later repaired to the Montana 12th Judicial District Court in Hill County where the Kafkas filed their second complaint. Contrary to what Mr. Bloomquist told you a few minutes ago, that second complaint filed in state court was not limited to causes of action arising under state law. In fact, it pleaded in language virtually identical to the complaint that's before the court in federal court. The constitutional challenges under both state and federal law. We moved to dismiss that complaint and in October of 2002, the State District Court, actually I should clarify, we moved to dismiss all but the takings count of that claim. And in October of 2002, the Montana District Court dismissed those constitutional challenges, leaving the takings claim intact. The takings claim was later tried in a bench trial that was conducted in May of this year and we are still awaiting a decision from the District Court on the takings claim. Takings claim under federal law or federal and state law? Federal and state law, Your Honor. A month later, in the first week of November. I'm sorry to interrupt. Was that a takings claim as applied, not a facial takings claim? Let's just say the argument on the takings claim in that state court case was the This particular property is so great as to have been a taking. Your Honor, the case, the claim was pled as both a facial and an as-applied taking claim. It was briefed in both respects. The post-trial proposed findings that were submitted by the plaintiffs focused almost exclusively, if not exclusively, on the as-applied aspect of the challenge, but the case was pleaded and briefed. Those questions are before the court. They are. Specifically, was the facial taking claim predicated on denial of economically viable uses of the property? Was that pled as well? Yes, it was, Your Honor. Okay. Have you argued res judicata in that Montana case based upon Judge Haddon's decision? Your Honor, we have not had the – had the – Judge Haddon's decision of the taking claim, which is the only claim left in front of the state court in that case, was without prejudice. I see. So there is no res judicata claim with respect to the taking. And the other issues, as the Court points out, having been decided adversely on the merits already, there was no opportunity or need to plead res judicata. Did Judge Haddon decide without prejudice the facial takings claim as well or only the as-applied takings claim? Your Honor, I don't believe his order is entirely clear. I believe his order with respect to the takings claim was that the claim was unripe. He did not distinguish clearly in his order between the facial and as-applied challenges. It's clearly unripe as to the – as to the as-applied. I believe the claim is to concede that it is, Your Honor. Hofka was a party in this case. Also in the state case you're referring to? That's correct, Your Honor. So the cases were parallel claims? They were. They were, Your Honor. The complaint in the state case is before the Court. It was in the record as part of the post-trial, post-hearing briefing that was done in the federal case. And if you compare that with the pleading that started this case in federal court, they're virtually identical. Was the Colorado River Doctrine argued in this case? It was not, Your Honor. Which brings us to November when the federal court complaint was filed in this case. They filed a federal court complaint, again, pleading both state and federal causes of action. A motion to dismiss was made. And Judge Haddon granted that, which brings us up to date with respect to the Hofka. Now, the Spokley proceedings are somewhat different. The Spokleys initiated their complaint in state court. Making challenges to the statutory interpretation that was adopted by the Department of Fish, Wildlife, and Parks. Those are issues of state law. And those issues were ultimately resolved by the Montana Supreme Court in its review of a preliminary injunction. It was issued by a state district court. And the Montana Supreme Court clarified that the conduct of the Spokleys was within the scope of the prohibitions of Initiative 143. So the statutory construction questions were resolved. Promptly afterwards, the Spokleys, on November 4th, I believe, of 2002, went into court and amended their complaint to add these constitutional challenges, again, using almost exactly the same language as had been pleaded in the first Hofka case in federal court and in the second Hofka case in state court. And two days after that, on November 6th of 2002, the federal court complaint was filed in this case. Now, this court has made clear that abstention is an equitable doctrine and that it ought to be invoked only in those circumstances in which abstention will clearly further the policies of the Pullman case to foster harmonious relationships between the state and federal courts. It's hard to imagine, under the procedural posture of this case, how an order from this court remanding for purposes of abstention could possibly further those interests in harmonious functioning of the state and federal courts, given the way the plaintiffs have pleaded these claims in both the state and federal courts. They have gone everywhere asking every court to invalidate this initiative under both state and federal law. The state courts have invalidated it. We asked for Rule 54B certification. The plaintiffs opposed it because they didn't want the Montana Supreme Court deciding that constitutional issue at that time. The plaintiffs in the first Kafka case dismissed the case rather than getting a final determination on the constitutional issues there. And now they come before this Court and ask this Court to send the case back. Now, let me make sure I understand the dismissal from the Federal District Court when it was before Judge Malloy. What's the consequence, if any, of that dismissal? Was that entirely without prejudice? Your Honor, it was. And I have to confess that in a weak moment I conceded to the plaintiffs' request that that complaint be dismissed without prejudice. I guess I wasn't prescient enough to foresee the flood of litigation that was to come. You just wanted a trip to Seattle, and now you have it. Quite right, Your Honor. It's so hard to get good coffee in Helena. So the point, Your Honor, is this. Pullman is designed around, as the Court observes, the need to allow state courts to resolve uncertain questions of state law before a federal court rules on federal constitutional claims. In this case, as the Court points out, the state courts have ruled on the only uncertain point of state law, which is the effect of Article II, Section 3 of the Montana Constitution. That's the fundamental right claim that they make with respect to the right under the Montana Constitution to own and protect property and to pursue the basic necessities of life. The state court has ruled on that claim in the Kafka state court litigation and rejected it. It's also been rejected by Judge Malloy in his preliminary injunction decision, and again by Judge Haddon in the decision in the court below. So it's hard to understand how there can be deemed to be an uncertain question of state law with respect to that. The law on that point appears to be quite well established. None of the judges who considered that point, Montana judges learned in Montana law, seem to have had any problem understanding that Article II, Section 3 of the Montana Constitution does not create a fundamental right to operate a game farm. So there is no, we would submit, uncertain principle of state law that would foster reliance on the Pullman Doctrine. And, of course, the Court has no discretion to abstain under Pullman unless there is an uncertain question of state law. So that ought to be an end to it. But even if there were some question of state law, the way this case is proceeded through the court system, it seems to me makes it difficult for the appellants in this case to argue that as a matter of the equitable foundations of Pullman, it makes sense to send this case back to the district court, to throw it back into the state courts that have already decided these questions, and delay yet again and further the final resolution of the constitutional claims. Is Montana takings law different in any material respect from Federal takings law? Your Honor, it is not. The Montana Supreme Court decided in a case in the mid-1990s called McIlwain v. State of Montana, which I believe is cited in the briefs, that the takings clause under the Montana Constitution is coterminous with that in the Fifth Amendment with respect to its substantive provisions. And, in fact, in that case, the Court readjusted the principles of Montana takings law, specifically with the intention to make Montana law consistent with Federal principles. Therefore, it seems to me, and I guess I want to hear a rebuttal if I'm wrong, that there's nothing in Montana law that we can learn that we do not already know. Your Honor, we believe that's true. And as a result, again, one of the three principles of Pullman doesn't exist in this case, and thus there was no discretion on the part of Judge Haddon to abstain. Okay. So why is this not a taking? I guess I should say that the facial and the as-applied are different. The as-applied is not ripe. Right. Which I think I agree with. Is the question of facial taking properly in front of us? Your Honor, we submit that it's not. We think Judge Haddon quite properly held all of the taking claims to be unripe. However, I will acknowledge that there is a complex set of issues with respect to the ripeness of taking claims in Federal law generally and in the Ninth Circuit specifically. There are two different lines of cases. There's the Southern Pacific transportation case, in which a panel of this Court tried, I believe, to bring some certainty and resolution to the sort of helter-skelter approach that the Courts had been taking to the ripeness question, and then subsequently there's Sinclair Oil and a couple of cases that follow it that carve an additional exception out of what the Court said in Southern Pacific. In Southern Pacific, the panel said that both facial and as-applied takings are not ripe unless the claimant has gone to State court and the State court has somehow not afforded a remedy to pursue compensation. In Sinclair, the panel subdivided further the ripeness question by carving out an exception for facial takings claims based on the issue of whether the regulation substantially advances legitimate State goals. And they held that a substantially advances claim is ripe regardless of whether it's been presented in State court, while the other kinds of facial takings claims are not ripe unless they've been presented. So you've got one panel of this Court, I would argue, overruling in part the decision of another. We would submit that the Southern Pacific transportation rule is the right rule. The United States Supreme Court has emphasized again and again that the takings clause of the Fifth Amendment doesn't prevent the State from taking, it only prevents uncompensated takings. And in Williamson, of course, the Supreme Court said that until and unless the State has denied compensation, there is no claim under the Fifth Amendment. That principle has been reiterated again and again, most recently I think in the Del Monte Dunes litigation in front of the Supreme Court, where the Court clarified that you cannot bring a 1983 claim based on a taking without first showing that there is an uncompensated claim for a taking in the State court. So it's hard to understand how there can be this small species of taking claim where presentation in the State court is not required when the Supreme Court has emphasized again and again that the absence of compensation is what makes the Federal claim. But, counsel, if we take issue a little with your characterization of the two cases as being in conflict and instead view them as being read together, that there's a carve-out. If we look at this issue as one of a facial takings challenge on the basis that the regulation fails to substantially advance illegitimate State interests, what would be your response to that issue? Well, Your Honor, I guess I'd like to propose a sort of a decision tree for the Court, if I could, to get you through this issue. We've argued that the taking claim in all of its manifestations is barred by the Eleventh Amendment because the defendant is the State of Montana, and, of course, the Eleventh Amendment bars claims for monetary compensation against States in Federal court. But the relief sought is not compensation. Isn't the relief sought in validation of the statute? Well, Your Honor, except I don't believe that that relief is available under the taking clause. I think the First English case clarifies that the remedy for a violation for a taking is compensation, not invalidation. So the remedy is monetary in nature, and it can't be pursued in the Federal district court against the State under the Eleventh Amendment. Now, the plaintiffs concede, I believe, that the Eleventh Amendment bars their claim against the State of Montana and the Department of Fish and Wildlife and Parks, and they claim that they can proceed on their taking claim against Director Hagner. That argument, I believe, fails because the nature of the only taking claim that's proceeding here, of course, is the facial challenge based on the failure of the initiative in their estimation to advance legitimate State goals. That's a claim that arises from the enactment of the initiative and not from its enforcement in a particular case. Jeff Hagner was not even in office in November of 2000 when this initiative was adopted. We argue that he can hardly be held responsible in a personal capacity for the decision of the voters to adopt this legislation. So they can't state a claim for relief against Jeff Hagner in his individual capacity, and we also argue that he's entitled to qualified immunity from suit because any obligation to any violation of the takings clause would surely not have been foreshadowed by clearly established principles of law. So let me get back to my decision tree point. Before you go back to that, is your argument that since this State official is really being sued in its official capacity, that it's a suit against the State and the State Treasury? Yes, Your Honor. That's precisely the point. Then why did you refer to qualified immunity? Well, as an alternative argument, Your Honor. We argue the Eleventh Amendment and that, in effect, this is an official capacity suit. If the Court were to disagree with that, then we believe qualified immunity would come into play and would be available to this official. But to the extent that this is a claim for money damages, it does involve the State Treasury, doesn't it? It does, clearly. So what we would propose is that the Court start first with the Eleventh Amendment question because, of course, if the Eleventh Amendment question prevails, there is no subject matter jurisdiction. The Court need go no further into this thicket about the rightness question. Then, if the Court gets by that point, look at the argument we make with respect to Southern Pacific as opposed to Sinclair, and also take into consideration that the Supreme Court has granted certiorari in the Chevron case. Now, this may take us too far afield, but is it established that the State is free from a takings claim under the Eleventh Amendment? Your Honor. Because I think they may be distinct from other forms of damage claims. Your Honor, there is a Ninth Circuit case that is not cited in the briefs that touches on that point and holds that States and agencies of the States are immune from suit under the Eleventh Amendment for damages for takings. The case is called Broughton Lumber v. I believe it's the Columbia River Gorge Association, and I'd be happy to provide the Court with a citation. Oh, I'm sure we can find it. So, yeah, I believe it is established. It was not incumbent on us to brief that issue in any detail because the plaintiff conceded that the Eleventh Amendment protected the State and the Department. And I guess, finally, as a final matter, if the Court deems it necessary to follow Sinclair, then this case, this particular minor part of the claim needs to be remanded to the district court for consideration of the substantially advances claim. Do you think the record is sufficiently developed for us to address that issue? Your Honor, we would urge you to because we think that the decision with respect to the legitimate State interest as outlined by Judge Haddon in his decision clearly supports the conclusion that this legislation substantially advances legitimate State goals. Your Honor, I'm eating into Ms. McMillan's time, so I'd like to move. I should have helped her out and stopped you. She wanted three minutes. Why don't we give her three minutes? Thank you, Your Honor. We'll submit the case on that basis. Would you please put three minutes on the clock? I certainly don't want to try the Court's patience on my first appearance here, so I'll go for one minute and 56 seconds. Oh, no. You've got three minutes and take them. They're all yours. I'm Sarah McMillan, and as Chris said, I represent the interveners in this case. The Montana Wildlife Federation and Sportsman of Fire 143. And I wanted to just sort of make a couple of points highlighting two things that I think are important on the takings issue because that seems to me particularly sticky one here. First of all, I think controlling precedent from this Court does clearly say that the facial claim that alleges the denial of economic viability of the property is not ripe until, for Federal judicial review, until the plaintiff has sought and denied compensation in the State court. And this Court has been consistent with that in the Hotel and Motel Association of Oakland, as well as most recently in the Ventura Mobile Home case. You reiterated that. So then the only issue really is the substantial advancement of legitimate State interests. And I would say that in the voters' pamphlet, which is in the excerpts of record, the supplemental excerpts of record, my clients, because this is in a legislative enactment, we have to look at what the voters voted on for what the purpose was. And what my clients set forth was that the purpose, there were two primary purposes, and they were to protect Montana's wildlife from disease and hybridization and also to protect the tradition of bear chase hunting and sort of the hunting heritage of Montana in general. And I think it's important to look at what the complaint alleges. There are no allegations in the complaint that relate at all to the protection of Montana's wildlife against disease and hybridization risks that are raised by game farms, nor is that claim about the disease and hybridization, which is a primary purpose of I-143, nor is that even briefed in the motion to dismiss, nor is it briefed here on appeal. So there is no, there have been no allegations that the purpose of protecting against disease and hybridization does not substantially advance a legitimate interest. And furthermore, in the first federal Kafka case, the Judge Malloy said that protecting hunting heritage was in fact a legitimate state interest. He said also the protection of disease and, against disease and hybridization is also a legitimate interest. So I think that any allegation that it's not a legitimate interest, that that isn't something that the State needs to protect. Now, I think your argument on that point is convincing. Now, I don't speak for my colleagues, but it had not occurred to me to think of it this way. Do we get to that argument if we think that the remedy sought is barred by the Eleventh Amendment? Is one argument prior to the other? I absolutely concur with Chris's decision tree, as he put it. I think you start with the Eleventh Amendment, and then you go to, you keep going down from there. So I don't think you do have to get to this. But my concern is if you do get to this, I don't believe the substantially advance a legitimate interest was actually raised. Oh, I used up all my time. It goes fast when you're having fun. Okay, thank you very much. I'm not sure how much time I have, but I'll be brief. Yes, question. What are the three things that the State court will answer? And, again, I want to point out to Mr. Tweeton, anyway, that was one of the questions. The fundamental rights claim, I think, will be articulated by the Montana Supreme Court. The takings claim will be addressed by the State court. He contends that the takings law under Montana law is identical to takings law under the United States Constitution. Do you disagree with that? The Montana Constitution is actually more expansive under the takings law than the United States Constitution. But he represents, and I confess I have not yet read the case, that the Montana Supreme Court in the mid-'90s brought the two both Federal and State laws into alignment. Is that wrong? Excuse me? He contends that the Montana Supreme Court in the mid-'90s, in a case that I have not yet read, has brought Federal and State takings law into alignment so that they are coextensive. Is he wrong about that? Yes. Okay. Montana's Constitution also is more expansive in terms of what can be a compensable deprivation in value. And the Montana Supreme Court case of Niaby City of Billings is a proposition for the damaging provisions of the Montana Constitution, which is more expansive than the Fifth Amendment. Okay. In terms of the district court's dismissal of the takings claim, as we pointed out in brief, the district court's analysis and standard was completely wrong. The total deprivation standard is simply not takings law. And we did the as-applied takings claim that we brought is barred by Williamson. That's one of the reasons we sought a stay of the Federal court matters so that the State courts, we could exhaust our State remedies prior to bringing the claim to Federal court, another reason we asked the court to abstain under Pullman. We do have a viable facial takings claim. And, in fact, the Eastern Enterprises case that we point out in our briefing stands for the proposition that declaratory and injunctive relief can issue under a takings claim. And so that was our response to the Eleventh Amendment bar that Mr. Tweeton was discussing. As far as the facial takings goes, that test is this, the idea of does the statute advance a legitimate State interest, and we briefed them. Okay. Yeah. Could you wrap up? We'll give you another 20 seconds if you have one last thought. Okay. Very quickly, the facial takings claim also, as this Court has pointed out in Christensen, what is the investment-backed expectation of the property owner? Let me just ask one question. Was the facial takings claim based on the lack of substantially advancing legitimate State interest? Was that raised in the district court, in your view? Yes. Actually, we briefed it both ways, the advancement of the State interest as well as the investment-backed expectation. Okay. And where was the advancement of State interest in the excerpts of record? Where can we find that? We raised it in our complaint in the allegations regarding the findings of the Department of Fish, Wildlife, and Parks that are contrary to the purported State interest that the State and the interveners have brought before the Court. In fact ---- All right. The short answer is the complaint? Yes. Yes. Okay. Thank you. Thank you. Thank you very much. Thanks, both sides, for a useful argument and an interesting case.
judges: Alarcon, W. Fletcher, Rawlinson